## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Kejuan Rogers,

       Plaintiff,

vs.

Commissioner of Social Security
Administration,

       Defendant.

CASE NO. 1:22-cv-02085

DISTRICT JUDGE
Charles Esque Fleming

MAGISTRATE JUDGE
James E. Grimes Jr.

**REPORT &
RECOMMENDATION**

Plaintiff Kejuan L. Rogers filed a complaint against the Commissioner of Social Security seeking judicial review of its decision denying disability insurance benefits and supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

### Procedural background

In May 2020, Rogers filed applications for disability insurance benefits and supplemental security income. Tr. 254–64. He alleged that he was disabled due to heart failure, aortic valve disease, post-traumatic stress disorder (PTSD), kidney issues, ulcers, liver issues, and borderline intellectual functioning. Tr. 115, 117. In the application for disability insurance benefits,

Rogers alleged a disability onset date of May 14, 2015.[1] Tr. 261. In the application for supplemental social security income, he alleged a disability onset date of May 1, 2020.[2] Tr. 254. The Commissioner denied Rogers's applications at the initial level and upon reconsideration. Tr. 192–211, 219–26. Rogers requested a hearing before an Administrative Law Judge (ALJ). Tr. 227–28. In September 2021, an ALJ held a hearing at which Rogers and a vocational expert testified. Tr. 41–69. The ALJ issued a written decision the following month, finding that Rogers was not disabled. Tr. 14–40. Rogers requested Appeals Council review. Tr. 247–53. The ALJ's decision became final in September 2022, when the Appeals Council declined further review. Tr. 1–7; *see* 20 C.F.R. § 404.981. In November 2022, Rogers filed this action. Doc. 1. He asserts the following assignments of error:

> 1. The ALJ erred when she failed to find that the opinions of the treating source and consultative examiner were consistent with and supported by the medical evidence and failed to incorporate the stated limitations into her RFC.

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

[2] Rogers in his brief claims that he alleged a disability onset date of "May 1, 2000." Doc. 7, at 1. He cites—broadly—to transcript pages 254–264 as providing that date. *See id.* Those ten pages include Rogers's Title II and Title XVI applications and, thus, both of his alleged disability onset dates. Tr. 254, 261. A letter from the Social Security Administration indicates that Rogers filed his Title XVI application on May 15, 2020 and alleged a disability onset date of May 1, 2020. *See* Tr. 254. According to the ALJ and Rogers's actual application, he applied on May 14, 2020. Tr. 20, 22, 33, 115. I deem Rogers's alleged onset date to be May 14, 2020.

2. The ALJ committed harmful error when she
failed to properly apply the criteria of Social
Security Ruling 16-3p and failed to find that the
intensity, persistence and limiting effects of
Rogers's symptoms, including pain, precluded
him from engaging in substantial gainful activity
on a full-time and sustained basis.

Doc. 7, at 1.

## Factual background[3]

### 1. *Personal and vocational evidence*

Rogers was born in May 1982. Tr. 33, 115. He was 38 years old on his

alleged disability onset date. Tr. 33, 254. Rogers has a GED and no past

relevant work. Tr. 33, 282.

---

[3]     Rogers filed applications under Titles II and XVI of the Social Security
Act for disability insurance benefits under Title II and supplemental security
income under Title XVI. Tr. 254–60, 261–64. Under Title II, an eligible
claimant must establish disability on or before the date last insured. *See* 20
C.F.R. §§ 404.101, 404.130–31. Rogers alleges a disability onset date of May
14, 2015. Tr. 261. He was last insured on September 30, 2016. Tr. 141. So
Rogers's relevant time period under Title II runs from May 14, 2015, to
September 30, 2016. The ALJ found that Rogers had not established a
medically determinable impairment during that time period and thus did not
qualify for disability insurance benefits under Title II. Tr. 20–21. Rogers does
not dispute this finding. *See* Doc. 7.
    The time period relevant in a Title XVI claim for supplemental security
income runs from the date on which the claimant filed his or her application.
20 C.F.R. §§ 416.330, 416.335; *see Bogle v. Sullivan*, 998 F.2d 342, 346 n.2 (6th
Cir. 1993). Rogers filed his Title XVI claim on May 15, 2020. Tr. 33, 254–60. So
the relevant time period for Rogers's Title XVI claim runs from May 15, 2020
until October 8, 2021, the date on which the ALJ issued her decision. Tr. 34,
254.
    I have generally limited the recitation of facts to those that are
chronologically relevant and related to Rogers's mental and physical
impairments between May 2020 and October 2021.

### 2. *Physical health impairment evidence*

In early March 2020, Rogers sought emergency medical treatment for chest pain and vomiting. Tr. 1736. Rogers said that he had "myalgia[]⁴ and general malaise" but hadn't fainted and his chest pain was not radiating. *Id*. The treating physician, Ryan Heaney, M.D., noted Rogers's history of heart failure, pulmonary embolism, esophagitis, and ulcers. *Id*. Dr. Heaney found that Rogers had myalgia, chest pain, shortness of breath, and fatigue, however, Rogers's pulmonary effort, breathing, heart rate, and heart rhythm were normal. Tr. 1737. Rogers was not in respiratory distress and had no wheezing or heart murmur. *Id*. His musculoskeletal range of motion and neurological system were normal. *See* Tr. 1738. His mood and behavior were normal. Tr. 1738. Dr. Heaney admitted Rogers to a progressive care unit. Tr. 1739. The next morning, Rogers reported continuing chest pain. Tr. 1745. His heart rate was "in the 30s." Tr. 1745. Rogers said that he had been experiencing constant left-sided, achy chest pain for a year. *See* Tr. 1745, 1747.

The progressive care unit physician diagnosed Rogers with bradycardia⁵ and transferred him to the intensive care unit. *See* Tr. 1745, 1747. Specialists from South Pointe's cardiology, pulmonology, and cardiothoracic surgery units provided consultation. Tr. 1745. Cardiothoracic surgeon Thomas Santoscoy,

---

⁴ Myalgia is pain in a muscle or group of muscles. Dorland's Illustrated Medical Dictionary 1197 (33rd Ed. 2020).

⁵ Bradycardia is a slow heartbeat evidenced by a pulse less than 60 beats per minute. Dorland's Illustrated Medical Dictionary 241 (33rd Ed. 2020).

4

M.D., examined Rogers and found an abnormal heart rhythm and a low heart rate of 56 beats per minute. Tr. 1745. Dr. Santoscoy recommended the installation of a permanent pacemaker[6] and scheduled Rogers for emergency surgery the next day. Tr. 1745, 7155.

The following morning, Rogers left the hospital against medical advice. Tr. 1745. He said that he was scared and did not want to have surgery. *Id*. He returned a half hour later with his mind changed. Tr. 1747. That afternoon, Dr. Santoscoy performed the surgical installation of the pacemaker. Tr. 1755. Rogers was discharged 24 hours after surgery with a prescription for Oxycodone-Acetaminophen (Percocet). Tr. 1763.

Less than four days later, Rogers returned to the emergency department and the care of attending physician Dr. Heaney. Tr. 1764. Rogers complained of heart palpitations and chest pain over his surgical site. Tr. 1773. The pain increased when Rogers inhaled deeply, so he had become short of breath. *Id*. The pain radiated from the left side of Rogers's chest to his neck and left shoulder. *Id*. Rogers admitted that he hadn't been wearing his post-surgery shoulder sling because doing so increased the pain in his neck and shoulder. *Id*. Dr. Heaney found that Rogers's pulmonary effort, breathing, and heart rate were normal. Tr. 1766. Rogers's heart rhythm was regular. *Id*. He didn't

---

[6]     Despite the record's interchangeable use of "pacemaker" and "defibrillator" to describe the device Dr. Santoscoy installed in Rogers's chest, *see, e.g.*, Tr. 22, 26, 1528, 1635, 1755, 1827, I will refer to the device as a pacemaker to avoid potential confusion.

5

appear to be in any respiratory distress. *Id*. Rogers had a normal range of motion but moving his left arm caused pain. Tr. 1767. His behavior, thought content, and judgment were normal. Tr. 1768. Dr. Heaney prescribed intravenous pain medication which resolved Rogers's shortness of breath. Tr. 1773. Although Dr. Heaney found that Rogers was in stable condition, he admitted Rogers for overnight monitoring. *See* Tr. 1772–73, 1779. Dr. Heaney advised members of the hospital's cardiology, pulmonology, and surgery units of Rogers's return and complaints. *Id*. The next morning, Rogers was discharged with a prescription for Oxycodone-acetaminophen (Percocet). Tr. 1780.

In mid-April 2020, Rogers underwent cardiac catheterization to check on the condition of his heart.[7] Tr. 2142–45. The results showed no evidence of significant disease. Tr. 2143, 2146. Rogers's cardiac output, filling pressure, and ventricle pressure were normal. Tr. 2143. Several weeks later, Rogers saw Dr. Santoscoy at the Cleveland Clinic Heart and Vascular Institute for follow-up. Tr. 1638–39. Rogers did not feel lightheaded and had no pain, shortness of breath, dyspnea upon exertion,[8] or edema. Tr. 1638. Rogers said that he still

---

[7]    Cardiac catheterization is an investigative procedure during which a small catheter is inserted into the heart through a vein in the neck, arm, or leg. Dorland's Illustrated Medical Dictionary 302 (33rd Ed. 2020).

[8]    Dyspnea is the medical term for breathlessness, shortness of breath, or difficult or labored respiration. Dorland's Illustrated Medical Dictionary 576 (33rd Ed. 2020). Dyspnea upon exertion happens when dyspnea is provoked by physical effort or exertion. *Id*.

had some pain, generally, though it had decreased. *Id.* Dr. Santoscoy was "pleased with Mr. Rogers['s] progress" and noted Rogers's ability to walk without difficulty. *Id.* Rogers wanted to address his "main concerns"—poor appetite and unwanted weight loss—with a primary care physician, so Dr. Santoscoy referred Rogers to family medicine practitioner Monique Turner Robinson, M.D. *Id.*

In May 2020, Rogers attended an evaluation via videoconference with pain management specialist Benjamin Abraham, M.D. Tr. 1649–57. Rogers wanted to address ongoing chest pain near the site of his pacemaker. Tr. 1635, 1649. Rogers described having constant "aching" pain which he rated at an "8" out of 10 in severity. *Id.* It was worse with movement and relieved by rest. *Id.* Rogers previously used Tylenol for pain relief and now used cannabis. *Id.* He had never tried an interventional pain management technique.[9] Tr. 1050. Dr. Abraham reviewed x-rays of Rogers's chest and found the images unremarkable. Tr. 1052. He suggested that Rogers have updated computed tomography images taken before they proceeded with treatment. Tr. 1052.

In August 2020, Natalia Eidlin, M.D., compared updated computed tomography images of Rogers's chest with views from five months earlier and

---

[9]     Interventional pain management can refer to any number of minimally invasive pain relief methods. *What is Interventional Pain Management*, Summit Spine & Joint Centers, https://summitspine.com/what-is-interventional-pain-management/ [https://perma.cc/D3R6-Y9TS]. Examples include a course of epidural steroid injections, nerve blocks, heat therapy, and pumps that release a small dose of medication directly to the area surrounding the spine. *Id.*

7

found the updated images unremarkable. Tr. 1635–36. Rogers's thoracic aorta and main pulmonary artery were normal. *Id*. He had no enhancement, inflammation or fluid collection adjacent to his pacemaker. *Id*. There were "no abnormal findings in the left chest wall surrounding the pacemaker" that would "explain [Rogers's] symptoms." *Id*.

In February 2021, Rogers had an initial appointment with primary care physician Dr. Monique Robinson. Tr. 2128–33. Rogers told Dr. Robinson that he had longstanding, constant sharp chest pain over the site of his pacemaker which worsened with deep aspiration and radiated to the right side of his chest. Tr. 2129. Dr. Robinson described Rogers as a "very pleasant young … man." Tr. 2131. Rogers did not appear to be in pain or distress. Tr. 2129. His chest wall was not tender with palpation. Tr. 2131. He denied shortness of breath at rest or with exertion. Tr. 2129. Rogers indicated that he could climb two flights of stairs without symptoms. *Id*. He denied smoking cigarettes but admitted smoking a pack of black and mild cigars every day. *Id*. Dr. Robinson advised Rogers to stop smoking. *Id*.

In July 2021, Rogers arrived at the emergency department of University Regional Hospital complaining of a "sharp and squeezing pain over his left chest." Tr. 2412. The pain had started the night before but Rogers said he had gone to bed hoping it would resolve by the morning. *Id*. He felt the pain return when he sat down to smoke a cigar the next morning. *See* Tr. 2412. The pain increased when Rogers sat up or lay down. *Id*. Rogers was alert and oriented

8

with a normal mood and affect. Tr. 2415. He wasn't short of breath or in any apparent distress. Tr. 2414. He had a normal heart rate with a regular rhythm and no murmurs, rubs, or gallops. Tr. 2414. Rogers had a normal range of motion and no tenderness in his muscles or joints. *Id*. Rogers's treating physician diagnosed his chest pain as musculoskeletal. Tr. 2415. Rogers was discharged later that day with prescriptions for pain medication and muscle relaxants. Tr. 2415, 2416.

### 3. *Mental health impairment evidence*

In March 2020, Rogers began seeing psychotherapist Jerry Carroll at I Matter Counseling and Empowerment Services. Tr. 2182. Rogers reported feeling sad and depressed, lacking interest in activities, and having trouble with focus. *Id*. Carroll found that Rogers was alert and oriented with appropriate behavior and appearance. *Id*. Rogers's speech was normal. *Id*. His insight and judgment were fair. *Id*. He had an intact memory with good concentration and attention. *Id*. His thought process and content were normal. *Id*. Rogers's mood was euthymic,[10] however, he had a flat affect. *Id*.

In mid-June 2020, Rogers began seeing psychiatric-mental health nurse practitioner Isaac Bofah, PMHNP-BC.[11] Tr. 1885–1900, 2188–89. For the next

---

[10]   Euthymia is the state of living with a calm and steady mood, typically feeling cheerful and tranquil with an increased resilience to stress. *Euthymia and Bipolar Disorder*, Healthline, https://www.healthline.com/health/euthymic [https://perma.cc/N58P-H5B3]. A euthymic person has. *Id*.

[11]   PMHNP-BC is the abbreviation for Psychiatric-Mental Health Nurse Practitioner, Board Certified. *Adult Psychiatric-Mental Health Nurse*

six months, Rogers saw Bofah every other week for fifteen minutes of psychiatric medication management and, occasionally, additional time for therapy. Tr. 1885–2124, 2188–89. During Rogers's initial evaluation, he reported feeling depressed every day and rated the severity of his depression at "9–10" out of ten. Tr. 1886. Rogers said that he had mood swings, racing thoughts, disturbed sleep, low energy, low interest, compulsions, anxiety, irritability, and trouble concentrating. Tr. 1886–88. He denied having panic attacks, agoraphobia,[12] intrusive thoughts, visual or auditory hallucinations, or memory issues. *Id*. He discussed his history of alcohol abuse and indicated that he had been sober since September 2019. Tr. 1894. Bofah found that Rogers was well-groomed with a cooperative but agitated demeanor. Tr. 1896. Rogers's speech was clear and his eye contact was average. *Id*. He had a depressed, anxious, and irritable mood with a constricted and tearful affect. *Id*. Rogers's thought process was logical and his memory, concentration, attention span, and impulse control were normal. Tr. 1897. Rogers had intact reasoning and vocabulary that was appropriate for his age and level of

---

*Practitioner Certification (PMHNP-BC)*, American Nurses Credentialing Center, https://www.nursingworld.org/our-certifications/adult-psychiatric-mental-health-np-renewal/ [https://perma.cc/R92F-HP4T].

[12]     Agoraphobia is the intense, irrational fear of open spaces characterized by a fear of venturing out alone or of being in a public place where escape might be difficult and help unavailable. Dorland's Illustrated Medical Dictionary 40 (33rd Ed. 2020).

education. *Id*. Rogers had poor insight but fair judgment. *Id*. Bofah prescribed Lamictal. *See* Tr. 1909.

Two weeks later, Bofah added Remeron to Rogers's medication regimen. *See* Tr. 1919, 1930. After one month, Bofah quadrupled Rogers's dose of Lamictal. Tr. 1930. In early July, Bofah added Seroquel. Tr. 1940. A few days after that, during an appointment with Bofah, Rogers complained that his symptoms had not improved. Tr. 1942. Rogers was stressed about "court coming up" and struggling financially. *Id*. He said that he didn't "do well under pressure." *Id*. Rogers reported "getting angry irrationally," having outbursts of anger, and described his anxiety as "out of control." *Id*. Bofah discontinued Rogers's prescription for Remeron, increased his dosage of Seroquel, and maintained Lamictal without adjustment. Tr. 1942, 1949–50. By mid-July, Bofah had doubled Rogers's dosage of Seroquel. Tr. 152, 1960. Rogers reported improvement in his sleep to three hours per night but also that he was living separately from his family due to his outbursts and anger. Tr. 1960. Bofah returned Rogers's dosage of Seroquel to its previous level and added Abilify to the medication regimen. *See* Tr. 1960, 1970, 1980.

By mid-August 2020, Rogers insisted that his medications be changed because they weren't effectively controlling his symptoms. Tr. 2003, 2010. Rogers reported having "very disturbing thoughts." *Id*. Rogers said that he had moderate to severe depressive feelings, severe mood swings, severe irritability, anxiety that he rated at a "9" out of ten in severity, and racing thoughts at a

moderate level. Tr. 2003–04. Bofah suggested that Rogers could "go[] to Marymount Hospital" as an outpatient to obtain pharmacological treatment in a controlled environment, but Rogers declined out of fear he'd be committed as an inpatient. *See id*. Bofah removed Abilify from Rogers's medication regimen and added Vraylar. *See* Tr. 2010, 2020.

Two weeks later, during a follow-up with Bofah, Rogers reported being agitated and said that he was "waking up in the morning with an attitude." Tr. 2013. Rogers reported that Vraylar wasn't helping during the day and that he had stopped taking Lamictal because he did not "see the effectiveness," however, Seroquel helped with his sleep. Tr. 2013. Bofah removed Lamictal and continued Rogers's other medications without adjustment. *See* Tr. 2020, 2030.

In September, Rogers reported feeling as if his symptoms were "wors[e] than when he first came in" and that the medications—Vraylar and Seroquel, at the higher dosage—were not working. Tr. 2023. He reported moderate to severe depressive feelings, severe irritability, moderate racing thoughts, impulse control problems, and anxiety that he rated at a "10" out of ten. Tr. 2023–25. Rogers said that he got eight hours of sleep per night and denied concentration changes, unusual thoughts, panic attacks, flashbacks, and chronic pain. Tr. 2025–26. Bofah added Trileptal to Rogers's medication regimen. *See* Tr. 2040, 2050.

In early October, Rogers reported no improvement with medication and treatment, however, he admitted that he had only been taking Seroquel because he hadn't refilled his other medications when they'd run out. Tr. 2053. Bofah replaced Roger's prescription for Vraylar with Zyprexa. *See* Tr. 2050, 2060. One week later, Rogers went to Marymount Hospital seeking emergency psychiatric care. Tr. 2195. He said that he wanted assistance with his medications, which he asserted weren't working. *Id*. Attending physician Harold Danell Robinson, M.D., found Rogers alert and oriented with normal behavior. Tr. 2197. He recorded Rogers's chief complaint as wanting a doctor to adjust his medications sooner than his regular doctor could see him. Tr. 2198. Dr. Robinson noted that Rogers had "no other complaints or concerns." *Id*. He referred Rogers to the behavioral health unit for further assessment but Rogers did not want to stay, so Dr. Robinson authorized his discharge. Tr. 2199–2204. Rogers was at Marymount Hospital for less than two hours. *Id*.

In mid-October, Rogers had a telehealth appointment with Bofah. Tr. 2063. Rogers reported severe mood swings and said, "[O]ne sec I will be cool, [the] next second, I will be snapping. There is never a moment of happiness." *Id*. He complained that his medications—Seroquel, Trileptal, Zyprexa—were not effective, though he acknowledged that his finances and avoiding the urge to drink contributed to his mood. *Id*. Later that month, Rogers reported that Seroquel improved his appetite and helped with his sleep. Tr. 2083. Bofah increased Rogers's dosage of Zyprexa "at bedtime for mood disturbance" and

13

decreased his dosage of Seroquel. *Id*. Two weeks later, Rogers said that he wasn't getting as much sleep but that his "impulses" were "better" on the lower dose of Seroquel. Tr. 2085. Rogers reported feeling depressed, having mood swings, and not sleeping at night. *Id*. By mid-November, Rogers reported "much better" anxiety and overall improvement with treatment, though he still reported feeling depressed. Tr. 2095. In December 2020, Rogers described himself as depressed but "hanging in there for the most part." Tr. 2115.

Bofah's notes show that over six months of treatment, Rogers regularly reported feeling depressed, anxious, and agitated and said that he was having uncontrolled anger issues, outbursts, and severe mood swings. *See, e.g.,* Tr. 1922, 1942, 1946, 1983, 2003, 2063. Bofah, however, routinely found that Rogers had a cooperative demeanor, clear or normal speech, a logical thought process, normal memory, attention, concentration, and impulse control, and intact capabilities in reasoning and abstract thought. *See, e.g.*, Tr. 1906, 1916, 1917, 1926, 1927, 1937, 1956, 1957, 1967, 1987, 1988, 1998, 2027, 2100, 2110, 2120. Sometimes, Rogers's mood was euthymic and his affect was full. *See, e.g.*, Tr. 2027, 2037, 2047, 2057, 2067. More often, Bofah noted Rogers's depressed, anxious, angry, or irritable mood and constricted affect. *See, e.g.,* Tr. 1896, 1905, 1916, 1926, 1936, 1946, 1956, 1966, 1976, 1987, 1997, 2007, 2017.

### 4. *Function reports*

Rogers completed function reports describing his illness, injuries, and conditions in July 2020 and March 2021. *See* Tr. 309–16, 327–34. When the

14

most recent report asked Rogers to explain how his impairments limited his ability to work, he wrote that his "mental health stop[ped him] from working." Tr. 327. Rogers specified that he could not work "under pressure" due to his anxiety disorder, did not work well with people, and could not follow instructions. *Id*. He checked boxes to indicate that his mental health affected his memory, completion of tasks, concentration, and understanding. Tr. 332. He said that he could not pay attention for a long time. *Id*. Rogers checked a box to indicate that he did not finish things that he started. *Id*. He wrote that he was "good" at following written and oral instructions, got along well with authority figures, and had never been fired or laid off from a job because of problems getting along with others. *Id*. Rogers provided much of the same answers in July 2020 as he did in March 2021, except that in the earlier report, Rogers's responses to the social interaction questions were different and he didn't explain how his impairments limited his abilities. *See* Tr. 309, 314, 315, 332.

5. *State agency and other medical opinion evidence.*[13]

In September 2020, consultative examiner Janis Woodworth, Ph.D., conducted a psychological evaluation. Tr. 1810–20. Rogers told Dr. Woodworth that he had been diagnosed with anxiety, depression, and bipolar disorder. *Id*. He said that prior to May 2018, when he used to work, he had difficulty getting along with supervisors and others, particularly if he was "under pressure." Tr. 1811. Rogers reported having symptoms of depression including feeling sad most of the time, moving slowly, lacking interest in activities like playing basketball, irritability, low energy, low self-esteem, difficulty concentrating, and social withdrawal. Tr. 1812. He said that he did not feel he had a purpose in life. *Id*. He rated his depression over the previous month at a "10" out of ten. Tr. 1813. Rogers reported having significant symptoms of anxiety, including excessive worry and apprehension, including about bills, kids, finances, and the future. Tr. 1811–12. He said that he was irritable and reported having one to two nightmares per week about the sexual abuse he'd suffered as a child. Tr. 1812. Rogers reported being hypervigilant, easily startled, and restless with difficulty concentrating. He had intrusive thoughts often and flashbacks on

---

[13] When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

occasion. *Id*. He told Dr. Woodworth that he experienced panic attacks—sweating, becoming shaky, jittering—for no reason every day that lasted for about 30 minutes. *Id*. Rogers denied having cognitive issues, mania, and disordered thinking. Tr. 1811. He rated his anxiety during the evaluation at an "8" out of ten. Tr. 1813. He reported that he had abused alcohol daily from the age of 14 but stopped drinking when he was hospitalized for congestive heart failure in 2019. Tr. 1812.

Dr. Woodworth diagnosed Rogers with PTSD, moderate alcohol use disorder, and unspecified bipolar and related disorders. Tr. 1816. She found that he was cooperative and had an adequate manner of relating. Tr. 1813. Rogers's speech was fluent and clear. *Id*. He had adequate expressive and receptive language skills. *Id*. Rogers's thought process was coherent and goal directed. *Id*. His attention and concentration were appropriate. Tr. 1814. Dr. Woodworth described Rogers's mood as dysthymic[14] and anxious and his affect as depressed and anxious. Tr. 1813. He did not appear to be in significant emotional distress. Tr. 1814. Dr. Woodworth estimated that Rogers had below average cognitive functioning, however, she noted that he responded to instructions and was able to follow them reasonably well. Tr. 1813–14. She found that Rogers's attention and concentration for complex tasks was poor,

---

[14] Dysthymia is mild, chronic depression. *Dysthymia (Mild, Chronic Depression)*, WebMD Depression Guide, https://www.webmd.com/depression/chronic-depression-dysthymia [https://perma.cc/P69H-923R]. Individuals with dysthymia have less severe and fewer symptoms than those with major depression. *Id*.

but for simple tasks, he was average. Tr. 1817. She found that Rogers's remote memory was below average but his working memory for simple and complex tasks was average. Tr. 1817.

Dr. Woodworth said that Rogers "may have difficulty" understanding, remembering, and carrying out instructions. Tr. 1818. She found that Rogers "may have some difficulty" maintaining attention, concentration, persistence, and pace during the performance of complex tasks, however he "should be able" to complete simple tasks. *Id*. Dr. Woodworth wrote that Rogers "probably [would] have some difficulty" responding appropriately to supervisors and coworkers in a work setting, especially if he wasn't on a stable medication regimen. *Id*. Dr. Woodworth said that Rogers "may have difficulty" responding appropriately to work-related pressure, particularly if he wasn't receiving mental health services. Tr. 1819.

In October 2020, consultative examiner Dorothy Bradford, M.D., conducted a physical examination. Tr. 1822–28. Dr. Bradford recorded Rogers's chief complaint as congestive heart failure and noted that he said his pacemaker had "fired three times" since its installation six months earlier. Tr. 1827. Rogers reported pain at the site of the pacemaker upon moving his left arm or turning over in his sleep. *Id*. Dr. Bradford noted that Rogers was not in any apparent physical distress. *Id*. His heart rate was normal. Tr. 1828. Its rhythm was regular without murmurs, rubs, or gallops. *Id*. Rogers's lungs were

clear. *Id.* His gait and strength were normal, as was the range of motion in his joints and other areas. *Id.*

Also in October 2020, state agency consultative psychologist Aracelis Rivera, Psy.D., reviewed the evidence. Tr. 125–26. Dr. Rivera found that Rogers was limited in all four areas of mental functioning—understanding and memory, sustained concentration and persistence, social interaction, and adaptation—but nonetheless retained the mental RFC to understand, remember, and perform tasks with one to three steps that did not require strict production standards or a fast pace. Tr. 126. Dr. Rivera opined that Rogers was capable of superficial contact with others and could adapt to routine changes without difficulty. *Id.*

In November 2020, state agency consultative physician Scott Bolz, M.D., reviewed the evidence. Tr. 115–28. Dr. Bolz found that although Rogers had multiple severe physical and mental impairments, he retained the residual functional capacity (RFC)[15] to perform unskilled labor at a light level of exertion with additional limitations. Tr. 121, 127.

In December 2020, at Rogers's request, Dr. Bolz reexamined his initial disability determination. Tr. 143–68. After reassessing the record, Dr. Bolz again determined that Rogers remained limited by multiple severe physical

---

[15]     An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

and mental impairments yet nonetheless retained the RFC to perform light, unskilled work with additional limitations. Tr. 148, 154. Dr. Rivera also agreed to reopen her initial disability determination inquiry. Tr. 143–68. After a period of reexamination, Dr. Rivera also again found Rogers limited in all vocationally relevant areas of mental functioning but able to perform unskilled work at a light level of exertion with additional limitations. Tr. 151–54.

In April 2021, during the formal reconsideration process, state agency physician Elizabeth Das, M.D., reviewed the evidence. Tr. 169–79, 182–91. Dr. Das affirmed Dr. Bolz's findings. Tr. 188. State agency consultative psychologist Kristen Haskins, Psy.D., reviewed the evidence during reconsideration as well. Tr. 169–79, 182–91. Dr. Haskins affirmed Dr. Rivera's findings. Tr. 190.

In August 2021, Nurse Bofah completed a Social Security Administration mental impairment questionnaire form. Tr. 2188–89. Bofah affirmed that he had provided psychiatric and mental health treatment to Rogers since June 2020. Tr. 2188. Bofah said that Rogers had bipolar II disorder, generalized anxiety disorder, chronic PTSD, and alcohol dependence which was in remission.[16] Tr. 2188. Bofah listed Rogers's medications—

---

[16]    Bofah recorded Rogers's diagnoses by ICD-10 code. ICD-10 is an abbreviation for the International Classification of Diseases, 10th Revision, Clinical Modification. *Coding and Recording Procedures*, American Psychiatric Association, https://www.psychiatry.org/getmedia/136283f7-0002-4ea7-ac1f-a6eb57647b4c/APA-DSM5TR-Coding.pdf (last visited Aug. 15, 2023). Each condition can be confirmed through the Centers for Disease Control's ICD-10 online                browser                tool                available                at

Buspar, Zoloft, Hydroxyzine, Trileptal, and Zyrexa—and when the form asked Bofah to describe any side effects that might implicate working, he wrote "N/A." *Id*. Bofah's clinical findings included "moderate symptoms of mood swings, irritability, anxiety, and sleep disturbance." *Id*. Bofah indicated that Rogers's prognosis was "unknown." *Id*.

The form then asked Bofah to rate Rogers's ability to complete various work-related activities or tasks within four broad areas of mental functioning. Tr. 2188–89. There was no task in any area of functioning in which Bofah found that Rogers had unlimited or very good ability. Tr. 2188–89. There was no task in any area of functioning in which Bofah determined Rogers had no useful ability. *Id*.

As to tasks that required sustained concentration and persistence, Bofah found that Rogers was unable to meet competitive standards in: (1) carrying out detailed instructions; (2) maintaining attention and concentration for extended periods; (3) working in coordination with or in proximity to others without being distracted by them; (4) completing a normal workday and workweek without interruptions from psychologically-based symptoms; and (5) performing at a consistent pace without an unreasonable number and length of rest periods. Tr. 2188. Rogers was seriously limited but not precluded from the ability to: (1) perform activities within a schedule; (2) manage regular

---

https://www.cdc.gov/nchs/icd/icd10cm_browsertool.htm [https://perma.cc/Q2EU-L84P].

attendance and be punctual within customary tolerances; and (3) sustain an ordinary routine without special supervision. *Id*. Rogers was limited but satisfactorily able to carry out very short and simple instructions. *Id*.

For tasks that implicated understanding and memory, Bofah found that Rogers was unable to meet competitive standards in understanding and remembering detailed instructions. Tr. 2189. Rogers was seriously limited but not precluded from remembering locations and work-like procedures as well as understanding and remembering very short and simple instructions. *Id*.

As far as social interaction was concerned, Bofah found that Rogers was unable to meet competitive standards in accepting instructions and responding appropriately to criticism for supervisors as well as getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. 2189. Rogers was seriously limited but not precluded from interacting appropriately with the general public. *Id*. Rogers was limited but satisfactorily able to ask simple questions or request assistance, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. *Id*.

Addressing tasks that involve adaptability, Bofah found Rogers unable to meet competitive standards in responding appropriately to changes in the work setting. Tr. 2189. Rogers was seriously limited but not precluded from setting realistic goals and making plans independently of others. *Id*. Rogers

22

was limited but satisfactorily able to be aware of normal hazards and take appropriate precautions. *Id.*

Bofah estimated that Rogers would likely be absent "days per week" and off task 75% of the work day on an ongoing basis as a result of his mental impairments and symptoms. *Id.*

### 6. Testimonial evidence

Rogers and a vocational expert testified during the hearing in June 2021. Tr. 41–69. Edwards was represented by attorney Michael Liner, who began the substantive portion of the hearing with an opening statement advocating that the ALJ find Rogers disabled. Tr. 47–49.

Rogers discussed his mental health with the ALJ. Tr. 53–56. He said that due to his mental health symptoms, he "just … [couldn't] work." Tr. 53. He wasn't able to work under pressure. *Id.* He found it hard to be around other people because he was not a "people person." *Id.* Rogers stayed home all day because he was "depressed all the time." *Id.*

Rogers discussed his anxiety with the ALJ. He said that even if a job only required simple, repetitive labor in an environment where he didn't have to interact with others, he wouldn't be able to do that job because his anxiety would make him feel overwhelmed. *Id.* Rogers said that his anxiety overwhelmed him, for example, when he took out the trash and when he washed the dishes. Tr. 53–54. Sometimes, his anxiety made it "really hard for [him] to just focus" on what he was doing. Tr. 53–54. When Rogers's anxiety

overwhelmed him, his heart began to race, he became shaky on his feet, and he started to sweat. *See* Tr. 58. He paced "back and forth" and wasn't sure "what to do next." Tr. 58. Rogers's anxiety made it hard to finish tasks that he started such as doing the dishes or cleaning. Tr. 58–59. Rogers said that he was "severely messed up." Tr. 59. He listed the medications that he was taking for his mental health: Oxcarbazepine, Buspirone, Hydroxyzine, Olanzapine, and Sertraline. Tr. 59–60.

In addition to mental limitations, Rogers discussed the physical limitations which he alleged precluded him from working full-time. Tr. 57–58. Rogers discussed his heart condition, for which he took Losartan, Spironolactone, Metoprolol, and Pantoprazole. Tr. 60. It was difficult for him to climb stairs and he needed to stop frequently to catch his breath. Tr. 57. He couldn't walk for long periods of time without sitting to take a break. *Id*. If Rogers stood for longer than an hour, he developed pain in his back and knees, lost his breath, and became wobbly and shaky on his feet. Tr. 57–58. Rogers could, however, sit for a long time without difficulty. Tr. 58. He had no trouble using his arms or hands. *Id*.

After Rogers, vocational expert Julie Sliga testified. Tr. 60. According to Sliga, a hypothetical individual with the same age, education, and work experience as Rogers and with the limitations assessed in Rogers's RFC, described below, could perform unskilled labor at a light level of exertion. Tr. 60–63. Jobs available to such an individual include cleaner, marker, and

24

writing clerk. Tr. 62–63. Being off task for more than 10 percent of the work day or absent for more than one day per month on an ongoing basis would preclude such an individual from all work. Tr. 63–64.

### The ALJ's decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2016.

2. The claimant has not engaged in substantial gainful activity since May 14, 2015, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. From May 14, 2015 through September 30, 2016, there are no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment (20 CFR 404.1520(c) and 416.920(c)).

4. As of May 14, 2020, the application filing date for Title XVI, the claimant has the following severe impairments: heart failure status-post defibrillator, borderline intellectual functioning, bipolar disorder, and anxiety disorder (20 CFR 416.920(c)).

5. As of May 14, 2020, the application filing date for Title XVI, the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

6. After careful consideration of the entire record, the undersigned finds that as of May 14, 2020, the application filing date for Title XVI, the claimant has the residual functional capacity to

perform light work as defined in 20 CFR 416.967(b) except: He can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. He can sit for 6 hours of an 8-hour workday. He can stand or walk for 6 hours of an 8-hour workday. He can never climb ladders, ropes, or scaffolds. He can occasionally climb ramps and stairs. He can frequently stoop and crawl. He can understand, remember, and apply information to carry out simple instructions in a routine type work setting without strict production quotas for time or quantity. He can interact with others to engage in brief conversations related to work such as to ask questions, clarify instructions, gather information, serve others, or point where items may be placed. He must avoid work that involves resolving conflicts between parties or directing the work of others.

7. The claimant has no past relevant work (20 CFR 416.965).

8. The claimant was born on May 4, 1982 and was 38 years old, which is defined as a younger individual age 18-49, as of May 14, 2020, the application filing date for Title XVI (20 CFR 416.963).

9. The claimant has at least a high school education (20 CFR 416.964).

10. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

12. The claimant has not been under a disability, as defined in the Social Security Act, from May 14,

> 2015, through the date of this decision (20 CFR
> 404.1520(g) and 416.920(g)).

Tr. 20–34.

## Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a, 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

27

20 C.F.R. §§ 404.1520, 404.1520. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir.

1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

## Discussion

*1.     Whether substantial evidence supports the ALJ's assessment of the medical opinions of nurse practitioner Bofah and Dr. Woodworth.*

In her decision, the ALJ found not fully persuasive the medical opinions of treatment provider Isaac Bofah, PMHNP-BC, and consultative psychological examiner Janis Woodworth, Ph.D. Tr. 29–31. The ALJ's rationale for finding Bofah's opinions not fully persuasive was that (1) Bofah failed to support or explain his limitations, particularly those in which he found Rogers unable to meet competitive standards, and (2) Bofah's limitations, particularly those that were more restrictive, were inconsistent with the other evidence in the record. Tr. 31. Rogers claims that if the ALJ had properly considered the record, she would have found ample support and explanations for Bofah's opinions. Doc. 7, at 11. He argues that the ALJ's failure to find Bofah's opinions more persuasive was error. *Id*. The ALJ's rationale for finding that Dr. Woodworth's opinions not fully persuasive was that Dr. Woodworth used vague

and imprecise terms to describe her findings and thus did not adequately quantify the limits of Rogers's abilities. Tr. 30. Rogers argues that this was error because, factually, Dr. Woodworth's opinions were supported by and consistent with other evidence in the record. Doc. 7, at 14.

Under the applicable standard, the Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, extent, and examining relationship; specialization; and other factors. 20 C.F.R. § 416.920c(a), (c)(1)–(5). *Supportability* and *consistency* are the most important factors. 20 C.F.R. § 416.920c(a). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id*. "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

*1.1 Nurse Bofah's opinions*

Despite the difficulty parsing both Bofah's and Dr. Woodworth's opinions, the ALJ did not find either to be wholly unpersuasive and, in fact, incorporated the spirit of many of their findings into the RFC. For example, Dr. Woodworth wrote that Rogers "should be able" to complete simple tasks. Tr. 1818. The ALJ limited Rogers to "carrying out simple instructions in a routine-type work setting" in the RFC. Tr. 24. Bofah found that Rogers was limited to varying degree in all social interaction tasks. Tr. 2189. In the RFC, the ALJ limited Rogers to brief, work-related conversations and determined that he must avoid jobs requiring conflict resolution between parties or the direction of others. Tr. 24.

In her assessment, however, the ALJ wrote that "Bofah failed to appropriately support or explain limitations, especially those that [Rogers was] unable to meet competitive standards" and found that Bofah's more restrictive limitations were inconsistent with other evidence in in the record. Tr. 31. The ALJ thus found his opinions less than fully persuasive. *Id*. Rogers claims that the record "contained numerous records which supported and explained [Bofah's] opined limitations" and therefore the ALJ should have given Bofah's opinions more persuasive weight. Doc. 7, at 11. In his brief, after reciting what he claims are the applicable standards, Rogers delivers Bofah's opinions from the Mental Impairment Questionnaire form then cites multiple pages of primarily self-reported symptoms to claim that substantial evidence supported

Bofah's findings and therefore the ALJ's discount of those findings was error. Doc. 7, at 11–14; *see* Tr. 2188–89. Rogers's argument fails for a few reasons.

As an initial matter, the ALJ said that Bofah didn't provide sufficient explanations for his opinions. Rogers doesn't say that Bofah *did* provide a sufficient explanation. Instead, he skips over that point and notes evidence that Bofah could have pointed to and that might support Bofah's opinions. In doing so, Rogers asks this Court to reweigh the evidence, which it cannot do. *Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x. 192, 196 (6th Cir. 2020). Rogers is essentially arguing that because he believes substantial evidence in the record exists to support Bofah's opinions, the ALJ's finding those opinions less than fully persuasive was not supported by substantial evidence. *See* Doc. 7, at 11–13. Whether, however, substantial evidence might be found to support Bofah's opinions is irrelevant because Rogers fails to show that the ALJ's finding—that Bofah's opinions were less than fully persuasive based on an internal lack of support for inconsistent, extreme limitations and those that determined Rogers was unable to meet competitive standards—was *not* supported by substantial evidence.

Moreover, the ALJ cited sufficient support in the record for her less-than-fully persuasive determination about Bofah's opinions and paid specific attention to the factors of supportability and consistency. For example, she referenced treatment notes from Jerry Carroll, who was Rogers's therapist at I Matter Counseling and Empowerment, and who found Rogers oriented with

32

unremarkable motor functioning and an appropriate appearance. *Id* (citing Tr. 2241–47). The ALJ discussed Carroll's findings that Rogers had normal speech normal and a euthymic mood "though [his] affect was flat." *Id*. Carroll found that Rogers had fair insight and judgment fair, good attention and concentration, and an appropriate thought process. *Id*.

The ALJ found that Bofah did not provide support for his opined limitations, which she noted had been expressed "us[ing] a form and check marks[.]" Tr. 31. In this regard, the Sixth Circuit in *Kepke v. Commissioner of Social Security* explained that although "checklist opinions are not *per se* unreliable" in social security cases, an ALJ can consider an opinion's checklist "format" and whether the opinion "'fail[s] to provide any explanation for [the doctor's] responses.'" 636 F. App'x 625, 630 (6th Cir. 2016) (quoting *Price v. Comm'r of Soc. Sec.*, 342 F. App'x. 172, 176 (6th Cir. 2009)). The ALJ found that Bofah hadn't completed the answer regarding Rogers's potential for absenteeism—Bofah wrote "days per week" but didn't include a number—and failed to provide facts on which his limitations were based. *Id*. She characterized Bofah's indication that Rogers would be "off-task 75% of the day" as an "entirely unreasonable" "extreme limitation" for which Bofah "failed to explain the reasoning." *Id*. To the extent that Bofah provided any explanation, he wrote that Rogers "portray[ed] *moderate* symptoms of mood swings, irritability, anxiety, and sleep disturbance." Tr. 2188 (emphasis added). The mere recitation of symptoms, particularly those described as moderate in

33

nature, does not support a limitation. Given the checklist nature of Bofah's opinion and its lack of any explanation, the ALJ was on a sure footing in discounting the opinion. *See Cohen v. Sec'y of Dep't Health & Hum. Servs.*, 964 F.2d 524, 528 (6th Cir. 1992) ("[T]he ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation."). The fact that Bofah's additional response, regarding Rogers's estimated absenteeism was incomplete further diminished the probative weight of Bofah's opinions. Tr. 31.

Having considered supportability, the ALJ then considered Bofah's opined limitations and the rest of the record and found Bofah's opinions inconsistent by comparison. *Id*. The ALJ, in her discussion of the medical opinion evidence and earlier in her decision, cited various findings, including those from Bofah's own treatment notes, that were inconsistent with Bofah's findings. Tr. 25–31. For example, Bofah found that Rogers would be unable to meet competitive standards to complete a normal workday or week without interruptions from psychologically based symptoms, and would be off task 75% of the day. Tr. 2188. There were, however, many instances in the record where Rogers's providers found him to have normal behavior, a normal or euthymic mood, and normal thought content, judgment, speech, memory, attention, concentration, and ability to reason. *See, e.g.,* Tr. 1768, 1896, 1897, 1906, 1916, 1917, 1926, 1927, 1937, 1956, 1957, 1967, 1987, 1988, 1998, 2027, 2037, 2047, 2057, 2067, 2100, 2110, 2120, 2182, 2415. The ALJ acknowledged symptoms

and diagnoses at odds with those findings, *see, e.g.*, Tr. 28–29, however, her determining Bofah's limitations—particularly those that were more extreme—inconsistent with the rest of the record was supported by substantial evidence.

So the ALJ assessed the supportability and consistency of Bofah's opinions, explaining as she did the rationale for finding them less than fully persuasive. Supportability and consistency are the only two factors the ALJ was required to articulate, and she did so with citations to substantial evidence in the record. And "[s]o long as substantial evidence supports the conclusion reached by the ALJ," it doesn't matter if substantial evidence also supports a claimant's position. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).

Rogers cannot refute the ALJ's findings by reciting a list, however extensive, of self-reported symptoms and prior diagnoses. *See* 20 C.F.R. §§ 404.1529, 416.929 (a recitation of symptoms does not alone support further limitations); s*ee also Dyson v. Comm'r of Soc. Sec.*, 786 F. App'x 586, 589 (6th Cir. 2019) ("disability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it.") (quoting *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("mere diagnosis… says nothing about the severity of the condition.). After claiming that the record supported Bofah's opinions, Rogers provided nearly an entire page of listed citations to the record referencing instances of Rogers self-reporting various symptoms including feeling depressed, mood swings, irritability, racing thoughts, anxiety, concentration issues, sleep

disturbances, impulse control issues, nightmares, and flashbacks. Doc. 7, at 13. But a list is not a legal argument. Rogers's consistent complaints do not implicate the supportability or consistency of Bofah's findings. Self-reported symptoms are, notably, not findings. And they say nothing about the severity of Rogers's conditions or their potential effect on Rogers's ability to function at work. As such, Rogers's list of symptoms and diagnoses does not overcome the ALJ's finding that Bofah's opinions were less than fully persuasive after sound supportability and consistency analysis.

Based on her analysis, it was reasonable for the ALJ to determine that although Rogers had impairments, the record did not support the "extreme limitations" Bofah placed on Rogers's abilities and did not support Bofah's findings that Rogers was unable to meet competitive standards in so many of the tasks listed. Tr. 31, *see also* Tr. 2188–89. The ALJ thus did not err in finding Bofah's opinions not fully persuasive.

### 1.2 Dr. Woodworth's opinions

In her decision, the ALJ found not fully persuasive the medical opinions of Dr. Woodworth, explaining that the consultative psychological examiner "used vague, imprecise words to describe her opinion and did not adequately quantify limits." Tr. 30. Rogers claims that the ALJ erred because Dr. Woodworth's "examination … was supported and was consistent with" notes from Rogers's treatment with Bofah and counselor Carroll, asserting that

"[t]he only contrary evidence provided by the ALJ [was] Rogers's Function Reports."[17] Doc. 7, at 14.

Rogers, again, ignores the standard of review and invites the Court to reweigh the evidence. *See Dyson*, 786 F. App'x at 588 (citing *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990)). As previously stated, review of these matters is conducted under a highly deferential standard of "substantial evidence." *Rottmann*, 817 F. App'x. at 196. In examining Dr. Woodworth's opinions, the ALJ specifically addressed the factors of supportability and consistency. Tr. 29–30. She found that Dr. Woodworth's opined limitations were not supported by the record, lacked consistency with the rest of the record, and were challenging even to define. *Id*. Rogers fails to show that the ALJ's less-than-fully persuasive finding regarding Dr. Woodworth's opinions was unsupported by substantial evidence.

The ALJ cited sufficient support in the record for her finding as to the opinions of Dr. Woodward. The ALJ found tenuous the connection between certain of Rogers's self-reports and Dr. Woodworth's ultimate findings. Tr. 30. She questioned Dr. Woodworth's reliance on self-reports as the sole basis for an opinion. *Id*. For example, the ALJ noted Rogers's assertions of daily panic attacks as the basis for Dr. Woodworth's opinion that Rogers "may have

---

[17]     Rogers also argues that his school records from August 1996 through September 1999 supported and were consistent with the psychological opinions provided by Nurse Bofah and Dr. Woodworth. Doc. 7 at 15–16. These records pre-date the relevant time period by two decades and are thus irrelevant to the current inquiry.

difficulty responding to work pressures." *Id*. She noted Dr. Woodworth's reliance on Rogers's "self-report of problems with supervisors" to support the finding that he "may have difficulty" with authority at work, pointing out, however, that this was "not consistent with" Rogers's statements to the contrary in his March 2021 function report. Tr. 30, *see* Tr. 332. Having heard Rogers's claim of past problems with supervisors, the ALJ wrote that Dr. Woodworth "vaguely said" Rogers "may have problems in the future if he is not medicated." Tr. 30. The ALJ cited Rogers's March 2021 function report, however, in which he denied problems with supervisors in the past, said that he got along "good" with authority figures, and indicated that he'd never been fired from a job for not getting along with others. Tr. 30; *see also* Tr. 332. Rogers claims that the ALJ erred by discounting Dr. Woodworth's findings regarding his ability to get along with others, noting that "Rogers wrote that he did not get along with authority figures due to his illness." Doc. 7, at 14. Rogers cites his July 2020 function report, in which he was asked how well he got along with authority figures and responded, "not well because of my illness." Tr. 315. Notably, Rogers neglects the contrary statements that he made—denying past problems with supervisors, asserting he got along well with authority figures, reporting he'd never been fired for not getting along with others—from the March 2021 report, the most recent and only chronologically relevant function report in the record. Tr. 30, 331, 332.

On this issue, and with respect to the ALJ's findings as to Dr. Woodworth's opinions generally, Rogers fails to establish that the ALJ's determination was not supported by substantial evidence. Again, Rogers ignores the standard of review. Whether substantial evidence exists to support Dr. Woodworth's opinions is irrelevant where substantial evidence also supports the less-than-fully-persuasive view adopted by the ALJ. *See Key*, 109 F.3d at 273.

Moverover, review of Dr. Woodworth's opinions shows that her use of vague and imprecise language did, in fact, obscure the degree of Rogers's limitation and ability to perform the tasks about which Dr. Woodworth opined. Tr. 30. For example, as the ALJ noted, Dr. Woodworth found that "[Rogers] *may* have some difficulty in maintaining attention and concentration, and in maintaining persistence and pace, to perform *complex tasks*, but should be able to complete *simple tasks*" yet she failed to define those terms by the number of steps required or any other measure. Tr. 30 (emphasis added).

The ALJ also found that Dr. Woodworth's opinions were replete with equivocal phrases that obscured the degree of ability or limitation Dr. Woodworth found Rogers's retained in performing a given task. Tr. 30. Opinion evidence, such as Dr. Woodworth's, with equivocal language such as "may," "should," and "probably" does not sufficiently establish the degree of limitation or ability the individual has to perform the task. *See Caldwell v. Comm'r of Soc. Sec.*, No. 3:19-cv-1909, 2020 WL 7684877, at *12 (N.D. Ohio Aug. 17,

2020), (determining that it was reasonable for an ALJ to find a restriction offered with the word "may" did not represent the most that the claimant could do) *report and recommendation adopted sub nom. Caldwell v. Saul*, No. 3:19CV1909, 2020 WL 7090025 (N.D. Ohio Dec. 4, 2020); *see also Wilson v. Colvin*, 2017 WL 370785, at *3 (E.D. Mich. Jan. 23, 2017) (finding that vague and imprecise language in an opinion regarding the degree of a claimant's capability gave the opinion less probative value), *report and recommendation adopted sub nom. Wilson v. Comm'r of Soc. Sec.*, No. 2:15-CV-13409, 2017 WL 710650 (E.D. Mich. Feb. 23, 2017). Since an RFC is "the most [an individual] can still do despite [his or her] limitations," 20 C.F.R. §§ 404.1545, 416.945, a medical opinion without properly defined limitations is of diminished probative value. As such, the ALJ did not err in discounting Dr. Woodworth's medical opinions due to vague and imprecise language and improperly quantified limitations. Tr. 29–30.

In sum, the ALJ sufficiently explained her rationale for finding the opinion evidence provided by Nurse Bofah and Dr. Woodward less than fully persuasive. Tr. 29–31. And so long as the ALJ explains her decision adequately, she is not obligated to fully adopt the opinion of a medical source. *See Wright v. Colvin*, No. 1:15-cv-01931, 2016 WL 5661595, at *10 (N.D. Ohio Sept. 30, 2016); *Jefferson v. Colvin*, No. 1:14-cv-01851, 2015 WL 4459928 at *6 (N.D. Ohio July 21, 2015). Rogers fails to demonstrate any specific flaw in the ALJ's logic or otherwise show that the ALJ's conclusions were based on less

than substantial evidence. Rogers may not agree with the ALJ, but disagreement does not "provide a basis for remand." *Steed v. Colvin*, No. 4:15cv01269, 2016 WL 4479485, at *10 (N.D. Ohio Aug. 25, 2016). The Commissioner's decision should be upheld.

2.    *Whether the ALJ properly applied the criteria of Social Security Ruling (SSR) 16-3p in evaluating the intensity, persistence and limiting effects of Rogers's symptoms and supported her findings with substantial evidence.*

In her decision, the ALJ evaluated Rogers's subjective complaints, including his pain, and concluded that although the record supported Rogers's having mental and physical impairments, it did not support symptoms with a severity, chronicity, or frequency as alleged by Rogers. Tr. 25. Rogers begins his argument on this issue by presenting principles that ostensibly establish how to assess credibility, review administrative decisions, and apply Social Security Ruling 16-3p. Doc. 7, at 16–17. Then, Rogers recites several pages of facts including those elicited during the hearing, in the function reports, and through the objective medical records.[18] *Id.*, at 16–19. Rogers says that he thus provided "evidence regarding the intensity, persistence, and limiting effects of Rogers's symptoms along with the limited nature of his daily activities and the difficulties he had." Doc. 7, at 20. He again returns to providing facts, listing many instances of his pain "that was well documented in the record." Doc. 7, at 20. Rogers says that the combination of "cardiac pain and shortness of

---

[18]    The facts from the medical record that Rogers included here in his legal argument were copied verbatim from his Statement of Facts. *Compare* Doc. 7, at 2–4 *with* Doc. 7, at 18–19.

breath" from which he suffered "limited his ability to function and complete his activities of daily living and precluded him from engaging in substantial gainful activity on a full-time and sustained basis." *Id*.

Five pages in, Rogers arrives at his legal argument. He contends that the ALJ formed the RFC without sufficient analysis of his symptoms, including his pain, in contravention to SSR 16-3p's requirements that an ALJ must provide specific reasoning for each finding and support each conclusion with substantial evidence. Doc. 7, at 21; *see* SSR 16-3p Titles II And XVI: Evaluation Of Symptoms In Disability Claims Social Security Ruling 16-3p Titles II And XVI: Evaluation Of Symptoms In Disability Claims, 82 Fed. Reg. 49,462 (Oct. 25, 2017).

SSR 16-3p provides "a two-step process for evaluating an individual's symptoms." 82 Fed. Reg. at 49,463. At step one, the ALJ should "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id*. At step two, the ALJ is to "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities for an adult or to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim." *Id*. at 49,464. Here, the ALJ found that Rogers satisfied step one. The ALJ found that while Rogers had impairments that could be expected to produce "some

discomfort and functional limitations, the objective evidence [did] not support his contentions regarding the severity, chronicity, and/or frequency of his symptoms." Tr. 25. So the issue is about step two. Under step two, an ALJ should consider the objective medical evidence and other evidence, including an individual's statements, medical sources, and non-medical sources. 82 Fed. Reg. at 49,464–65. And when "evaluat[ing] the intensity, persistence, and limiting effects of an individual's symptoms," the ALJ should consider the factors in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). *Id.* at 49,465. These factors are:

> 1. Daily activities;
>
> 2. The location, duration, frequency, and intensity of pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at 49,465–66.

According to Rogers, "[i]t is clear that the evidence in this matter established that Rogers satisfied the criteria set forth in SSR 16-3p" and "the ALJ failed to "articulate any supportable rationale for her finding that" Rogers was not precluded from all types of work. Doc. 7, at 21. Rogers has seemingly ignored the ALJ's decision, which belies his argument.

The ALJ explicitly recounted the two-step analysis required by SSR 16-3p. Tr. 24–25. So she was plainly aware of SSR 16-3p. Next, the ALJ reviewed Rogers's written and oral statements. Tr. 25. She reviewed the relevant objective medical evidence, including the records of Rogers's treatment with nurse practitioner Bofah, pain management specialist Dr. Abraham, primary care physician Dr. Robinson, during various visits to the emergency departments of local hospitals, and cardiac testing and imaging. Tr. 26–29. The ALJ reviewed the medical opinions and prior administrative medical findings. Tr. 29–32. Throughout her analysis of the evidence, the ALJ discussed the factors in SSR 16-3p, albeit without specifically referencing each factor. *See* Tr. 24–32. The ALJ concluded this section by writing that "the evidence does not corroborate the claimant's allegations of symptoms attributed to his impairments to an extent that would preclude the performance of light work with the restrictions stated above." Tr. 32.

During her examination of the evidence, the ALJ recited Rogers's daily activities. The ALJ summarized Rogers's activities alongside his statements regarding the effect of his impairments on his ability to work. Tr. 24–25 (citing

44

Tr. 290–87, 309–16, 319–26, 327–34). She noted that Rogers could prepare meals such as sandwiches, canned food, and noodles, pay bills, shop, and read. Tr. 23. The ALJ wrote that Rogers spent time with friends and family, attended church, and lived with his family. Tr. 23–24. Despite Rogers claiming to have trouble concentrating, focusing, following instructions, and completing tasks, he was able to prepare meals, watch television, read, manage his own funds, and attend church. *Id*. The ALJ recited Rogers's claims of difficulty handling change, getting dressed, and bathing, noting, however, that Rogers could handle his own self-care and personal hygiene. *Id*.

The ALJ considered Rogers's pain. She wrote, for example, that Rogers complained of persistent chest pain at the site of the insertion of his pacemaker, reported it as "very tender to the touch" and "worsen[ing] with movement." Tr. 26 (citing Tr. 1528). Rogers indicated that he'd taken Tylenol and Motrin for the pain, with minimal relief. Tr. 26. An arterial image showed that Rogers had no large vessel occlusion or high-grade stenosis, and x-rays of Rogers's chest showed no active cardiopulmonary disease. *Id*. (citing Tr. 1594). The ALJ discussed Rogers description of the pain as an aching, burning, stabbing pain in his left upper chest. Tr. 26 (citing Tr. 2226). The ALJ recited Rogers's pain complaint from an emergency department visit in December 2020, including midsternal chest pain that was "gradual in onset, non-radiating, exacerbated and alleviated by nothing." Tr. 27. In February 2021, the ALJ noted, Rogers reported continuing longstanding constant chest pain

45

that was "retrosternal and radiating to the right side of his chest." *Id*. The ALJ highlighted Rogers's pain, at that time, which was sharp pain and worsened with deep inhalation.  *Id*. She considered that Rogers required emergency care in July 2021 for sharp, squeezing left chest pain which he reported had begun the night before and returned the morning that he went to the hospital. Tr. 27 (citing Tr. 2392). In detailing Rogers's pain, the ALJ discussed its location, duration, frequency, and intensity and the "factors that precipitate[d] and aggravate[d]" it, such as when Rogers was "recumbent." Tr. 27.

The ALJ also discussed the "type, dosage, effectiveness, and side effects" of Rogers's medications. She recited times at which Rogers requested that his psychiatric medication be adjusted and complained that it wasn't working. Tr. 28. She recited other times at which Rogers reported improvement with medication and treatment. *Id*.

The ALJ considered Rogers's pain management treatment with Dr. Abraham, noting that Rogers complained of constant pain in his chest for a year "following no inciting event." Tr. 26. (citing Tr. 1647–57). Rogers said that his pain was an "8" out of ten in severity, exacerbated by movement and mitigated with rest. *Id*. The ALJ noted that Rogers had been treating his pain with cannabis. *Id*. She wrote that Rogers didn't appear to be in acute distress, his mood and affect were appropriate, and his respiration was "unlabored." *Id*. He was diagnosed with neuralgia, neuritis, and chronic pain syndrome. *Id*. The ALJ therefore contemplated "measures other than treatment [that Rogers]

used … to relieve his pain and other symptoms[,]" such as interventional pain management. Tr. 26.

In a relevant counterpoint, the ALJ also discussed evidence that showed Rogers's occasional non-compliance with treatment. By way of example, the ALJ considered Rogers's admission to Nurse Bofah that he had stopped taking Lamictal on his own because he did not see the effectiveness. Tr. 28; *see* Tr. 2013. The ALJ indicated that when Bofah suggested that Rogers go to Marymount Hospital to "pinpoint [the] appropriate medication regimen[,]" Rogers "wasn't willing to go because he didn't want to run the risk of hospitalization." Tr. 28, *see* Tr. 2003. When he did finally go to Marymount Hospital, Rogers left before being evaluated by the behavioral health staff. *See* Tr. 2199–2204. The ALJ also noted Roger's daily cigar smoking, though she included that he and his primary care doctor had decided on a date by which he would stop smoking. Tr. 27.

With respect to Rogers's mental health impairment claims, there are multiple instances of providers finding Rogers's his mood normal or euthymic, his judgment normal or fair, his speech clear, and his behavior, thought process, thought content, memory, attention and concentration, and reasoning ability normal. S*ee, e.g.*, Tr. 1768, 1896, 1897, 1906, 1916, 1917, 1926, 1927, 1937, 1956, 1957, 1967, 1987, 1988, 1998, 2027, 2037, 2047, 2057, 2067, 2100, 2110, 2120, 2182, 2415. With respect to Rogers's physical impairment claims, the record reveals a history of cardiovascular disease and the installation of a

pacemaker during emergency surgery in March 2020. Tr. 1669–1810. After the surgery, however, Rogers's primary physical complaint was chest pain. *See, e.g.*, Tr. 1649, 1773, 2129, 2142. Throughout the relevant time period, the record shows that Rogers regularly had a normal range of motion, motor strength, gait, and no muscle or joint tenderness. *See, e.g.*, Tr. 1738, 1767, 1828, 2414. His heart rate was normal with a regular rhythm and no murmurs, rubs, or gallops. *See, e.g.*, Tr. 1737, 1766, 2415. Cardiac testing and images showed no evidence of disease or were unremarkable. Tr. 2143, 2146. At times, Rogers denied shortness of breath on exertion or at rest, and chest pain. Tr. 1638, 2129, 2131.

So the ALJ followed the requirements of SSR 16-3p[19] in her analysis and cited substantial evidence in the record in support of her conclusions "so [that] the individual and any subsequent reviewer [could] assess how the [ALJ] evaluated [Rogers's] symptoms." SSR 16-3p, 2017 WL 5180304, at *10. The ALJ's narrative detailed specific reasons for each finding. In contrast, Rogers fails to articulate how the ALJ's conclusions were not supported by substantial evidence. He presents an extended recitation of the facts and implies that the

---

[19]     Even if the ALJ failed to consider all the Ruling 16-3p factors, Rogers's argument would still fail because "an ALJ is not required to analyze all seven factors." *Pettigrew v. Berryhill*, No. 1:17-cv-01118, 2018 WL 3104229, at *16 (N.D. Ohio June 4, 2018), *report and recommendation adopted*, 2018 WL 3093696 (N.D. Ohio June 22, 2018). Rather, it is sufficient that an ALJ "consider[s] the relevant evidence," *id.*, which the ALJ did.

Court should reweigh the evidence and rule in his favor. But it is not the Court's role to reweigh the evidence. *See Rottmann*, 817 F. App'x. at 196.

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: August 28, 2023

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).